Hey, fella. Be careful, careful! Not the land rights. Hey, look at this. See that dude? Okay, RP-1 fuel cell, v. United States. Mr. Weiner? Weiner, Your Honor. Mr. Weiner. Please proceed. Good morning, and may it please the Court, Andy Weiner for the United States Department of Treasury. This case is about payments in lieu of tax credits under Section 1603 of the American Recovery and Reinvestment Act of 2009. Applicants RP-1 and SJ-1... argue that the definition of fuel cell power plant in IRC-48C1C does not include Appley's gas conditioning equipment because it was not necessary for the operation of fuel cells using natural gas. Correct, Your Honor. Would it have been legal for Appley's to operate without the gas conditioning equipment? I'm sorry, I heard some rustling. I just didn't hear your question. I apologize. Would it have been legal for them to operate without that gas conditioning equipment? Yes, Your Honor. It would have been. In fact, they... So the situation here is they bought a standard fuel cell package that was designed to run on natural gas. The gas conditioning equipment had played no role in the operation of the fuel cell power plants on natural gas, nor was it required to by law. The gas conditioning equipment provided additional functionality for those fuel cell power plants. I'm sorry, some of the language here may be kind of important, but it can't be true that the gas conditioning equipment played no role in the operation of the fuel cell. It did if the fuel was coming out of the waste. I was about to say, the gas conditioning equipment was necessary to operate the fuel cell on biogas, but Judge Wallach's question, I believe, was with respect to natural gas. No, it wasn't. And so as a practice... It certainly was not about natural gas. Okay, I apologize then. I misunderstood. I mean, your whole position comes down, I think, to the proposition that because fuel cells can operate on natural gas, maybe even, and I want to ask you about the record question, maybe even many, many, many of them do operate on natural gas. Therefore, the only equipment that is covered by, I guess, Section 48, is that which is necessary to operate a particular fuel cell if it were operating on natural gas. And choices about operating it on other fuels are really not to be considered in determining whether the particular fuel cell is what the base for the 30% compensation is. This is all your position. Intended use of the particular fuel cell is irrelevant, because fuel cells in general, I think is your point, operate on natural gas. It's not our position that fuel cells in general operate on natural gas. Our position is that the fuel cells that are at issue here, that were acquired, the standard package that they purchased, it's a turnkey fuel cell that is capable of operating on natural gas out of the box. And so there you've met the terms of the statute. You have an integrated system necessary to convert a fuel into electricity using electrochemical means. That's the language of the statute. And so here, what taxpayers are asking for in their claim here for an additional $1.5 million is they customize their fuel cell to be able to operate on other fuels, biogas. And we're saying that that customization is not provided for under the credit. Does either the record say or do you know as background fact what the general market for fuel cells is? Are a lot of them used only for natural gas or is the only real market for fuel cells for this kind of thing where natural gas is used either as a starter or a backup, but in general people don't use fuel cells unless they're going to use something other than natural gas. Do we know anything about that? I believe that in the record there is testimony that most fuel cells operate on natural gas or other gases that would not require the heavy conditioning that biogas does, like propane or methane. But basically my understanding, again this is entirely from the record, is that fuel cells require effectively the same, it uses the same energy that you get in combustion except it's an electrochemical process. So it can run on anything that can combust in theory. Where in the statute does it mention standard package or natural gas or basic operation? Well, it does not mention anywhere in the statute. But what it does mention is it defines the integrated system by the conversion of a fuel into electricity. And so therefore when they bought in this particular case the standard package, which was capable of converting natural gas into electricity, you've met the terms of the statute. That's how Congress delineated the credit in this case and that's what they're entitled to. If they want to customize based on their particular intended use to run on biogas, or I can think of a million different variations where they have to customize the particular unit, that is not provided for by Congress. They use natural gas as a startup and you make that as one of your points. What percentage of their operations were on natural gas? It varied based on the particular unit. For ARPA-E1 the evidence is that for the first 10 months' time frame they operated on about 69% biogas, 31% natural gas. For SJ-1 they operated on, I believe, 91% biogas and 9% natural gas. The natural gas is used not only when the gas conditioning equipment might be down, but there's also testimony in the record that sometimes biogas doesn't have the necessary BTUs. There's not enough energy in the biogas. We're talking about sewage here. There are variations, I imagine, in the type of sewage being run through the waste treatment plants. There's not enough energy sometimes to harness so you have to blend. There are contracts that say that they needed to operate on at least 75% in order to qualify for some state credits, but at least with respect to one of the facilities they didn't do that so far as the time period for which we have evidence. You contend that the fuel cell equipment and the gas conditioning equipment are separate systems because they're provided by separate suppliers. Does the statute distinguish? If I may, Your Honor, we weren't saying that they're separate systems just because they're provided by separate suppliers. What we're saying is that is evidence of the fact, the fact that they purchased a fuel cell power plant that was capable of operating without seeking another supplier to provide gas conditioning equipment is evidence of the fact that the credit applies to the fuel cell power plant and not the gas conditioning equipment. The fact that they started up on natural gas and we're converting a fuel into electricity, months in RP1's case, several months before they ever ran it on biogas, is evidence of the fact that... Can I ask if the desulfurizers do not play a role when, is this right, when they're operating on the biogas that's going through the gas conditioning and then the gas conditioner is sending it directly into the fuel cell? It's not perfectly clear from the record, Your Honor, but I believe that to be true, yes. So suppose they had gone to, is it UTC, is that the purveyor and maybe there are other... No, they are UTC. The purveyor would be fuel cell energy, I believe. Okay, fuel cell energy and maybe there are, I hope that there are other sellers of this and somebody said, you know, we have two standard packages. You can buy this without the desulfurizer. If they had bought the fuel cell without the desulfurizer and then bought gas conditioning equipment, would they get to include the gas conditioning equipment in the base to which you apply the 30%? I think that would be a question that, I mean, there's a 60-day review period when you get these applications for payment. And it goes to NREL, a scientific lab, and they look to various factors. They look to the science of the equipment that's being claimed for payment. They also look to the contracts. If, for example, if they said, well, we're trying to maximize our credit here, so don't give us the desulfurizers now, but we're going to need to be able to run on natural gas in the future, so we're going to pay for desulfurizers separately. Right, but the simple fact here is that there are two fuels that are sometimes being used in the Ontario version a fair bit, in the San Jose version not that much. And your position is you get to choose one of them and say as long as you can operate on that one, the cost for that operation is all you're going to get, and the other one we're not going to give that similar privilege status to. So why, somewhere near the heart of this is a question, why privilege natural gas as the choice of fuel as opposed to the other one? I would respectfully disagree with this idea that we're choosing just between two different gases and we're choosing the one that's most advantageous. I think the evidence in the record supports the fact that effectively what they're doing is stacking technologies. So they've bought a fuel cell power plant that's capable of running on natural gas, and now they need to buy another piece of equipment that costs two or three million dollars, depending upon the facility, that was able to clean the biogas to get it to the fuel specifications that natural gas already has. The desulfurizers are used as a fail-safe mechanism. They're not necessary for all cleaning. What they are is that the evidence in the record supports that natural gas sometimes has spikes in sulfur. The amount that a public utility cleans natural gas is not necessarily to the specifications of a fuel cell power plant. And so you have to have the desulfurizers there because there's some variations in the quality. Does all the natural gas run through the desulfurizers, or do you know something about how much indesirable stuff, how much sulfur, I guess, is in the particular natural gas, and you can say route that one through the desulfurizer and the other one just hook right up to the fuel cell? I believe, again, it's not entirely clear from the record as to the channels, the piping, but I believe that the record supports that all of the natural gas was run through the desulfurizers, but the desulfurizers didn't have to clean most of it. It was there as a fail-safe mechanism. When there's a spike in sulfur, the desulfurizers then purify that sulfur out of it. But most natural gas has a low enough or maybe a nonexistent sulfur content to be able to meet the specifications that the fuel cells require, the fuel specifications. Therefore, it is not like the gas conditioning equipment where if you run biogas into the fuel cells, within a day you would have poisoned your fuel cell power plant. The desulfurizers, I think, they do clean the natural gas, but they clean it based on variations in the fuel quality of the pipeline natural gas that's running in as opposed to taking a filthy biogas product and having to effectively condition it significantly or you're necessarily going to poison your fuel cells. Can I ask, you don't make any argument for any kind of deference here. Can you offer me any intuition about why? This is not the clearest statutory language I've ever read. That's the kind of situation. It's a good starting point for what the government practically all the time says is giving me some kind of deference under any label, and yet you don't know people about that. Let me put it two ways. One is that we think that the statute is perfect. Suppose I disagree with you about the first point. We did not argue our deference below. Our? We're talking about a statute. I'm sorry. Chevron or any variety? Again, Chevron would be, we're not suggesting that there are regulations that dispose of this. This is a review process that we've made a determination based on the statute directly, and so I'm not exactly sure. Our case does not rely on administrative authority that would resolve this. No, but you're an administrator. You're an agency. You've got an application. You read the statute, and it has these various terms,  and you say, well, we actually think at least for these particular Ontario and San Jose units, maybe even more generally, we think that that means, should mean, what's necessary to run it on kind of the quasi-universal, or at least here, necessary default fuel, natural gas, and no more. Why do you not say the statute allows that even if it doesn't require that? The statute, I'm sorry, the statute, we're saying the fact that it's... Allows you to say they bought the natural gas standard equipment, so in that circumstance they get only the cost of the natural gas equipment, the desulphurizer, and the rest is what you would call customizing. Maybe in another case, if they had done the other hypothetical, namely forget the desulphurizer, we're going to shut the thing down unless we have biofuel to operate on. It might be different. The statute is just not compellingly clear about what to do, and this is why we have agencies. Well, Your Honor, I think on top of the fact that we do think that the language of the statute is pretty clear as to how we've applied it here, we also pointed the court's attention to the doctrine that you have to construe the language of fuel cell power plants narrowly, and I think that's a pretty well-established principle, and I think it's perfectly applicable in this case, that the idea that Congress creates deductions and credits, and by virtue of the fact that they are matters of legislative grace, Congress is not required to give anybody a credit for anything. Right, and that principle has, I mean, I agree that has some force. On the other hand, what is it, the earlier history, is it Section 48 has at least some case law that says, well, maybe these investment tax credits are not quite so charitably interpreted? Yes, Your Honor, with respect to a completely different statute. Isn't it an earlier version of this? It's the same statutory number, but if you look at what section, if you look at Section 46 today, prior to 1990, there was a statutory scheme. Section 38 provided an investment and a tax. You're going to have to wrap up. I apologize, Your Honor. To make it short, it is, you're right, the same code section. It's a completely different statute, and the investment tax credit went way beyond green energy. It talked about investments in manufacturing and investments in transportation. It was an infrastructure. It was just to create, to spur investments in general, and this is a completely different statutory scheme. I'll reserve the rest of my time. I apologize, Your Honor. You don't have any time to reserve, Counsel. I'm going to give you two, because we ate it up all year. Thank you. May it please the Court, Tim Jacobs for the plaintiffs who are the appellees, and if it pleases Your Honors, I'd like to address some of the questions that were asked, because I think they're very important. I think the first question from Judge Wallach was, can you operate these power plants legally without the gas-conditioned equipment? The answer to that is no. First of all... I misspoke, because I read from his quote that did say natural gas, and I have to apologize to you, Mr. Wiener, but you're addressing what I meant. This anaerobic digester gas, these wastewater plants, if they don't use the anaerobic digester gas for a fuel source, they have to flare it. You can see in places you drive around here, in some of these wastewater treatment plants, they flare that gas. So what these facilities do is actually utilize that gas, but they have to clean it before it goes into the fuel cells. Now, the testimony before the Court, including plaintiff's expert, and also the government's expert, was that if you used this anaerobic digester gas because it's so dirty in this fuel cell, that it would destroy the fuel cells within a couple hours. And, by the way, natural gas has to be cleaned as well. That's why you have the desulphurizers. Now, the government contends that... I think one of the questions from Judge Taranto was, do you need the desulphurizers or are they offline any time? The testimony before the Court and the findings before the Court, or the Court of Federal Claims made, was that the desulphurizers, every gas that goes through a fuel cell, because it's so sensitive, has to be cleaned. Gas conditioning equipment, in every case, is a balance of plant. You have to have it. And I believe the government actually, in their reply brief, even indicated that it's a standard piece of equipment for cleaning gas in a fuel cell power plant. Standard piece of equipment. If it's a standard piece of equipment, then it's a balance of plant for purposes of the statute, and obviously it's integrated because you need it. The other question I think that was raised was... And by the way, is that true for all fuel cell installations? There's one exception. If you can build a fuel cell power plant in any laboratory, and you get pure hydrogen, you may be able to run it through the fuel cells without damaging them. That's the one exception. I'm sorry, I didn't ask my question precisely enough. Are there fuel cells in operation out there that don't have desulfurizers? That don't? There was a claim here, and I don't think it's contested, that at least this seller of fuel cells offers the desulfurizer as part of the standard package. Is it true that that's universal? There are only a couple of fuel cell providers. And by the way, there's only two cases that really have this issue. That's how limited the universe is here. I think there are a couple of manufacturers. One is Fuel Cell Power Energy, which was involved in this case. They typically put the desulfurizer with their package of equipment. There's another company called UTS, and there are a couple of companies that have gone out of business. I'm not aware of what those particular groups provide, but I think a lot of it goes back to, what is your contract? These are suppliers. If you don't have to buy the desulfurizer, you're not going to do it. But what is typical is, is you will start up these facilities with natural gas because it's more efficient to use that and it's more reliable for the startup period, which is very important. And that's what we saw here. I mean, the government's citing some statistics about the startup period where they used a little bit more natural gas than biogas for a certain period of time. Well, that's typical of any power plant. You're going to do that. The other question I think was asked was the numbers. What numbers are we looking at here? And there was testimony about that, and actually the court made findings, and I wanted to raise that for the court. It's JA-49. I want to back up to your initial point. And you indicated, I think correctly from the record, that you have to have desulfurizers somewhere in line. Whether you get it in your initial package or you go out and buy it, can you run a plant without desulfurizers and not destroy your fuel cells? You have to have it. I mean, the testimony, and I grew up in western Pennsylvania, had a lot of natural gas pieces. You put the smell in it, it's the sulfur. They actually add that so that you know it's leaking. That has to be cleaned out. That's why it's called desulfurizers. If that goes through that fuel cell, it will destroy it. So it doesn't matter whether it's natural gas or whether it's digester gas. It just has to be clean. It has to be. In every instance, if you're going to operate a fuel cell, you have to have that equipment. And, you know, in most cases where you're going to use, let's just say the San Jose plant. Can I just, I mean, the more true that is, the more it seems to me to help the government. That is that fuel cells, let's assume you take that to an extreme. Every fuel cell sold and installed has desulfurizers. Now, the rest is optional. Why is that not a justification for the government to give privileged status to that which is necessary to run the fuel cell, because you always have to have desulfurizers? Well, I think, again, we have to look at the facts. The facts here are, like San Jose, the contracts and requirements are 100%. You have to operate that facility on 100% biogas. There is no so-called standard package. This was one of the questions that was asked. What are the numbers? And in the testimony before the court, and this is actually on JA 49 or page 48 of Judge Warren's opinion, the numbers in California where most of these plants are, roughly 50% operate on biogas. So this is not just a couple of facilities. So if you go to the fuel cell energy literature. So the other 50% run just on natural gas? Yes. Oh. I'm sorry. So, I mean, it's 50% the facilities operate on biogas and 50% operate on natural gas. In California, in the United States at least, that's where most of these facilities are. So you have a situation where if you're operating on biogas,  But go back to, let's take this back to the statute. What does the statute say? Well, first of all, the statute says a fuel. It doesn't say natural gas. It doesn't talk about standard package. A fuel is, as the Court of Federal Claims found, detailed findings about what that means. Look to the Department of Energy. Look to the Energy and Information Association as to what that means. Well, it's a broadly defined term. It means a fuel. It includes natural gas. It includes anaerobic digester gas. It includes anything that a fuel cell can operate on. And what we're saying is that many fuel cells operate on biogas. And if you operate on biogas, you have to have the gas conditioning equipment. But I would go to the legislative history, which actually both parties cite. The legislative history for the enactment for the fuel cell power plant incentive says it expresses a preference by Congress, because this is a renewable energy statute, by the way, for a non-conventional fuel. Well, a non-conventional fuel is biogas. Of course, natural gas is a conventional fuel. So Congress, in its legislative history, expressed a preference for a non-conventional fuel. And it makes total sense when you're looking at Section 48, which is an investment tax credit, which incentivizes renewable energy, that it makes sense that Congress would have made the statute broad enough to include the renewable energy, which it did. Another point. The government keeps saying that the statute has been repealed. Well, I think that was the last question that was asked. Well, the reality is the investment tax credit, which had general application, that was repealed in 1990. That's true. But the ITC for the investment tax credit for energy property, which is in Section 48, that's been around since the Energy Tax Act of 1978. And it's changed certain iterations. But that same statute, for example, solar, has been in there for the whole time period. At one point it was 10%. Now it's 30%. So the government keeps saying there are different statutes. The reality is they're the same exact statute over the course of time. And what you have with Section 1603, that provision was policy reasons one way or another,  But Congress enacted Section 1603 to provide a grant in lieu of the investment tax credit. It did that because all of the investments had dried up. It included fuel cell power plants in there, and it housed the entirety of Section 1603 in the investment tax credit structure. Indeed, the legislative history says it was designed to mimic the operation of the investment tax credit. So the court here... Let me see. So let's assume that the whole country is like California and 50% of the fuel cells operate only on natural gas and the other 50% operate on some combination of natural gas and the biofuel. The first set, the first 50%, get the 30% applied to the fuel cell plus the desulfurizer. The second set get more. Why does that make sense? They don't get more. You're getting paid for the desulfurizer. So you want to get paid for the desulfurizer, 30%, plus 30% of the gas conditioning equipment, right? Well, you have to... Isn't that more? Well, there are situations where a lot of folks get more for the particular layout of the plant. Don't tell me, yeah, that's just fine. I mean, is the premise correct? Well, they actually get the additional, you know, the funds for putting in that necessary equipment. That's right. Okay. But I'm not sure that that's relevant disrespectfully because the statute says you get the credit. I mean, the statute is not limited to natural gas. It's not limited to a standard package. It says a fuel. It includes specifically balance of plant components. Now, the reality is there is a cap on the credit, and we're well below that cap. Congress put a cap in there so that you didn't run into the problem where somebody was building a big plant. And you're only getting 30%. I mean, somebody's not going to build something in order to put in, you know, invest funds. Just so I understand, I mean, I think you are just defending the proposition that when you customize by adding a second piece of fuel equipment to a plant that could, in fact, operate, forget about California's laws, could, in fact, operate the way 50% of California's fuel cells do operate just on natural gas, you get to be paid not only for the desulfurizer, which everybody does, but in addition for the gas conditioning equipment. And you say that's what the statute says. That's what I think the statute says, absolutely. And I disagree that it's customization because when you build a power plant, you build it according to the ground up. Why did they build these plants at the wastewater treatment plant? They built these plants at the wastewater treatment plant to operate in the free biogas, not to purchase natural gas. These plants would never have been built if they were going to operate on natural gas. And that was clear from the testimony and the findings of the court of federal plans. So I don't agree that it's customization at all. I think this is just how you build a power plant. There are power plants all over the country that have various configurations. In fact, I will tell you this. The government's lead reviewer testified that the government will allow the cost of roads to be reimbursed under the statute. Now, roads have very little to do with the fuel cell power plant in terms of generating actual power, but they are nevertheless integrated and necessary in particular circumstances. Now, the government's not going to call that customization because they allow the reimbursement for those roads. And that's typical of what I've seen in what the Treasury's done. The reason they don't like the gas conditioning equipment here is because they view this as different than some of the other fuel cells that they've seen. But it's a limited pool. And the reality is that, as I mentioned, there are at least 50% of biogas plants in California that are operating on biogas. And if Congress is expressing a preference under a renewable energy statute for a nonconventional fuel, which biogas is, why would you take out gas conditioning equipment, reward natural gas, which is a fossil fuel, and force these folks to have an uneconomical plant? I'm sorry. What is there in 48C-1-C that expresses any preference for one fuel over another that goes into this preferred kind of power plant? The statute itself refers to a fuel, but the legislative history, which is cited in our briefing papers and our response brief, actually does say that. Right. But this gives a preference for fuel cell power plants as opposed to non-fuel cell power plants, and it doesn't matter what fuel is put into it. That's correct. That's correct. But this is a broader statute. I mean, the use of a broader term doesn't mean it's restricted. I mean, the term a-fuel is a broad term. Congress did not limit it to a specific fuel, which meant that they wanted to incentivize fuel cell power plants. Including really stinky, filthy fuel. Well, it is, but isn't this just a great use of something otherwise that would be wasted? I mean, these wastewater treatment plants become self-sufficient, you know, pretty much self-sufficient on this fuel. And why would we waste it and just put it up in the air? Why would Congress not want to incentivize that? And they question why Treasury and the National Renewable Energy Laboratory, which actually reviews these, why they would not want to incentivize this type of plant. I know the Department of Energy has encouraged folks, such as our taxpayer here, to build these plants and build them at wastewater treatment plants because of the abundance of this energy source. I see my time's running, but I did want to make some points. We stand by our brief on the Treasury. I'll give you two minutes because you're closing council. I stand by our brief on both the trace facility issue and the fuel cell power plant, but I want to make a point about the fuel cell power plant. One is, the statute talks about an integrated system. The government makes that a critical point and it cites cases, including this court's decision in the Hawaiian refinery. When you look at that opinion and they say it's timing versus scope, the reality is that opinion did focus on intended use and design and purpose. In fact, that was the seminal case on placed in service and timing issues. I think this court has already looked at that issue. When you determine what is an integrated system and an integrated unit of property, it includes consideration of the design and what the specifically assigned function of the plant is. Moreover, the court in that case, actually the court of claims decision there, actually the origin of the intended use piece is actually the ITC regs under section 48, if you read the court of claims trial division opinion, which this court embraced in the Hawaiian refinery. Thank you, counsel. With my two minutes, I'm going to just address a few points regarding fuel cell power plants. I guess I will have to leave the statutory ticket of trash facilities to the court, unless it has any specific questions. I just wanted to mention our trash facility argument that while the processes at the plant, including the inputs into the anaerobic digesters, while that is taking place, that is a treatment process as definition under the Clean Water Act and regulations. Therefore, that is not solid waste, which would be sludge from a waste treatment plant. Returning to the points that were made regarding fuel cell power plants, I think the important point is that the statute, I think everybody agrees that the statute clearly doesn't preference one fuel over another, in terms of a fuel that's converted into electricity. The problem is what inference to draw from it. It says, to summarize here, what's necessary to use a fuel, so whatever fuel they're using, what's necessary to use that, that's covered. Again, Your Honor, I think the idea is that once you get to, and clearly natural gas is a fuel, and we don't dispute the biogas as a fuel, but once you've gotten to the point where you've met the conditions of the statute, natural gas, and you haven't actually gone out to the marketplace and bought your gas conditioning equipment, you don't get that customization. The legislative history, I don't think, supports the other side here. The legislative history shows that Congress intended to encourage investments in these types of systems, fuel cell power plants. It said that fuel cell power plants are good because they process, they produce electricity without combustion. Great. They said it also has potential uses for using non-traditional fuels. However, so do other types, more traditional types of power generation systems, allow for the use of biogas as well, and in fact, at these plants, they were using non-traditional fuel sources. The fact of the matter is that Congress, let me just finish this one sentence, Your Honor. Congress provided a credit for a fuel cell power plant, and that's what they got, and they don't get the gas conditioning equipment. Thank you, counsel. Thank you.